Filed 7/28/26  Dillon v. City of Los Angeles CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| GRADY DILLON,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CITY OF LOS ANGELES ACTING BY AND THROUGH THE LOS ANGELES DEPARTMENT OF WATER AND POWER and MANUEL MIGUEL MEDINA,<br><br>    Defendants and Appellants. | B339538<br><br>(Los Angeles County Super. Ct. No. 19STCV14977) |

APPEAL from a judgment and an order of the Superior Court of Los Angeles County, Graciela L. Freixes, Judge. Affirmed.

Panish | Shea | Ravipudi, Robert S. Glassman, Jonathan H. Davidi, Thomas A. Schultz; Downtown L.A. Law Group, Farid Yaghoubtil, Nina Sargsyan; and Esner, Chang, Boyer & Murphy, Holly N. Boyer, Kiran R. Iyer for Plaintiff and Respondent.

Everett Dorey, Seymour B. Everett, III, Samantha E. Dorey, and Christopher D. Lee for Defendants and Appellants.

This is a personal injury lawsuit arising from a motor vehicle accident. The main issue on appeal is whether the evidence compels a finding that plaintiff's negligence was a substantial factor in causing the accident as a matter of law. We hold that the evidence does not compel such a finding.

Plaintiff Grady Dillon sustained serious injuries after his motorcycle collided with a Los Angeles Department of Water and Power (LADWP) van driven by Manuel Miguel Medina. Video footage of the accident shows Medina making an unprotected left turn across two lanes of southbound traffic and failing to yield to Dillon's oncoming motorcycle.

Dillon sued Medina and LADWP (collectively, defendants) for motor vehicle and general negligence causes of action. After a three-week jury trial, the jury returned a verdict in favor of Dillon. The jury found that Dillon and Medina were both negligent—based on Medina's failure to yield to oncoming traffic and Dillon's excessive speed—but that only Medina's negligence was a substantial factor in causing the accident.

On appeal, defendants do not challenge the jury's findings that Medina was negligent and his negligence was a substantial factor in causing the accident. Instead, defendants contend the jury's finding that Dillon's negligence was not a substantial factor in causing the accident is unsupported by substantial evidence. As we shall explain, defendants apply the wrong standard of review. To prevail, defendants must meet the nearly impossible burden of showing that the evidence compels a finding that Dillon's negligence was a substantial factor in causing the accident.

Defendants also contend a new trial is warranted for various other reasons, including: (1) the trial court abused its

2

discretion in denying defendants' motion for new trial; (2) the trial court abused its discretion by precluding defendants' counsel from referencing certain evidence in closing argument; (3) plaintiff's counsel committed prejudicial attorney misconduct; and (4) the noneconomic damages award was excessive. Finally, defendants argue the trial court abused its discretion in granting Dillon's motion for attorneys' fees based on defendants' denial of two requests for admission.

We reject defendants' arguments and affirm.

## BACKGROUND

On the morning of April 12, 2019, Dillon was riding his motorcycle down Main Street in Los Angeles heading south. Medina was waiting to turn his LADWP van left (northbound) onto Main Street from a stop sign on College Street. Dillon had the right of way and no traffic signal or stop sign in front of him. A surveillance video admitted at trial showed Medina's van pulling onto Main Street directly in front of Dillon and Dillon's motorcycle colliding with the van.

Dillon was traveling at approximately 59 miles per hour in a 35 miles per hour zone when he was 580 feet from the collision. Dillon testified he accelerated to pass a box truck. After passing the box truck, he decelerated to approximately 51 miles per hour, before "hard braking" when Medina's van entered Main Street. Dillon's motorcycle crashed into the van at around 38 miles per hour.

Dillon sustained serious injuries as a result of the accident. He was taken to the hospital after the accident, where he underwent several surgeries. Since the accident, according to Dillon, he is always in "excruciating pain."

3

On April 30, 2019, Dillon sued LADWP and Medina for motor vehicle and general negligence causes of action. Defendants generally denied the allegations in the complaint and, as an affirmative defense, asserted that Dillon was comparatively at fault for any damages sustained.

Trial began in February 2024. In Dillon's case in chief, his counsel read excerpts of Medina's deposition to the jury, wherein Medina testified that both he and Dillon were at fault for the accident. Medina explained that he "failed to yield the right of way" to Dillon. At trial, however, Medina recanted his admission of fault, stating that he had since "seen the video" of the accident. But Medina continued to acknowledge that he failed to yield the right of way. Consistent with Medina's testimony, the video of the accident—which was repeatedly played for the jury—shows Medina's van pulling out across the two lanes of traffic without giving way to Dillon's motorcycle.

Both the plaintiff and defense called accident reconstruction experts. Plaintiff's expert, Steven Anderson, testified that Dillon passed the box truck at "a little over 59 miles an hour" and then decreased speed once he passed the box truck. He further testified the van became an "obvious hazard" to Dillon when it "accelerated and moved into the roadway" 1.7 seconds before the accident. At that point, Dillon's motorcycle was "121 feet away" traveling about 54 miles per hour. Anderson explained that when something becomes an obvious hazard "then you begin to react to it. . . . Before you do anything in reaction to another vehicle, you have to perceive it." The trial court sustained defendants' counsel's objection to Anderson's explanation of an "obvious hazard" on the ground it was "beyond the scope" of his expertise.

4

During a sidebar in chambers, the court stated that Anderson could not give perception reaction time (PRT) analysis because he had not been designated as a human factors expert. But the court stated Anderson could "give an opinion based on distance and speed as to when something became a hazard or whether collision could have been avoided by either side." Anderson then testified again, without objection, that the van presented itself as a hazard to the motorcycle when the motorcycle was "120 feet away from the crash." In response to counsel's question regarding the distance it would have taken for Dillon to stop if he was going 35 miles per hour (i.e., the speed limit) from 121 feet away from the crash, Anderson responded: "[T]he braking distance itself would be about 68 feet. But that's not everything involved in stopping." Anderson concluded, "to a reasonable degree of mechanical engineering certainty," if Dillon had been going 35 miles per hour when he was 121 feet away from when the van presented itself as an imminent hazard, Dillon still would not have been able to avoid the crash.

Defendants' accident reconstruction expert, Henricus Jansen, disagreed with Anderson's opinion that Medina started his left turn when Dillon's motorcycle was only 121 feet from the crash. Jansen testified Medina "[took] off" and started to "execute his left turn" when the motorcycle was still 280 feet away from the crash, which was "more than enough [space] for [Medina] to make his left turn" if Dillon was traveling at the speed limit. Jansen therefore opined that Dillon's speed was the sole cause of the accident.

Defendants then called their human factors expert, David Krauss. Krauss testified that "human factors" is "the study of how people take in information, process it, and respond to it." He

5

further explained: "So light hits our eye, that light gets transferred to our brain, our brain does some processing on it, and then we generate some response to that information." With respect to driving specifically, Krauss explained PRT as follows: "This is what has to happen in your brain and in your body before the vehicle does anything. So something happens in front of you. Before your foot slams on the brake or you initiate a steer, your brain has to tell your body to do that." It is the time someone "detects a hazard to the time they respond to it."

Krauss noted studies showing that motorcyclists confronted with an unexpected hazard generally have a PRT of "1 to 2-and-a-half seconds." The trial court permitted Krauss to publish a chart showing that with a PRT of 1, 1.5, 2, or 2.5 seconds, a vehicle's stopping distance at a speed of 35 miles per hour is 110 feet, 135 feet, 161 feet, and 187 feet respectively. Relying on Jansen's testimony that "the van started pulling out at 3.9 seconds before impact when Dillon was 280 feet from the crash, and Dillon began braking around 1-and-half seconds to impact," Krauss then opined that "if we give [ ] Dillon a 2-and-a-half second perception-response time, again, which is about what he had, it would have taken him 187 feet to stop at the speed limit, and that was available to him."

In closing argument, Dillon's counsel argued that, based on Anderson's testimony and Krauss's testimony, the crash would have still happened even if Dillon was not speeding: "[Defendants] say that Mr. Dillon was presented with a hazard from the van when Mr. Dillon was 280 feet away so that they can prove to you that . . . the accident would not have happened if he was going 35 miles per hour. But that's what Mr. Anderson talked about, that Mr. Dillon wasn't presented with a perceptible

6

immediate hazard until he was about 121 feet away from where the van is. And that's when the perception-reaction time starts. That's when you decide to brake, and that's when you brake. And as we walk through, if you're going 35 miles per hour when you're 121 feet away from where the accident is and you're quick and you brake as soon as that hazard is presented to you, you are still going to crash. You are still going to crash. And Dr. Krauss's chart that we're going to go through later demonstrates that."

The jury returned a verdict on March 22, 2024. It found Dillon and Medina were both negligent but only Medina's negligence was a substantial factor in causing the accident. The jury awarded Dillon $1,545,000 in economic damages, $3,000,000 for past non-economic loss from the date of the accident until judgment was entered, and $6,500,000 for future noneconomic loss for the next 34 years (Dillon's expected remaining years of life). On April 10, 2024, the court entered judgment for Dillon and against defendants.

Defendants then moved for a new trial and judgment notwithstanding the verdict (JNOV). After a hearing, the trial court denied both motions.

Dillon moved for attorneys' fees and costs under Code of Civil Procedure section 2033.420, subdivision (a) based on defendants' failure to admit the truth of certain requests for admission. The trial court granted the motion in part, concluding defendants unreasonably denied Dillon's request that they admit the "fail[ure] to yield to Plaintiff." It then awarded fees in the reduced amount of $52,500.

Defendants timely appealed from the judgment, and the order denying their new trial and JNOV motions, and granting in part plaintiff's motion for attorneys' fees.

7

## DISCUSSION

### I. The Evidence Does Not Compel a Finding that Dillon's Negligence Was a Substantial Factor in Causing the Accident as a Matter of Law

#### A. Standard of Review

" 'We generally apply the familiar substantial evidence test when the sufficiency of the evidence is at issue on appeal.' " (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465.)  But where, as here, "the trier of fact has expressly or implicitly concluded that the party with the burden of proof failed to carry that burden and that party appeals, the substantial evidence test does not apply."  (*Petitpas v. Ford Motor Co.* (2017) 13 Cal.App.5th 261, 302 (*Petitpas*).)  Instead, the question becomes " 'whether the evidence compels a finding in favor of the appellant as a matter of law.' "  (*Ibid*.)  "Specifically, the question becomes whether appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' "  (*LaFace v. Ralphs Grocery Co.* (2022) 75 Cal.App.5th 388, 409.)  This burden is " 'almost impossible' " to meet.  (*Garcia v. Stoneledge Furniture LLC* (2024) 102 Cal.App.5th 41, 53.)

In their opening brief, defendants incorrectly frame the issue as whether substantial evidence supports the jury's finding that Dillon's negligence was not a substantial factor in causing the accident.  In their reply, however, defendants do not dispute that Dillon applies the correct standard of review, i.e., whether the evidence compels a finding in favor of defendants as a matter of law.  Rather, they argue "[u]nder either formulation of the standard of review, the admissible evidence compels a finding of

8

comparative fault as a matter of law."  For the reasons discussed below, we disagree.

### B.    Analysis

Defendants have not met their burden on appeal to show the evidence compels a finding that Dillon's negligent speed was a substantial factor in causing the accident.  As we shall discuss below, the jury was entitled to disbelieve the testimony of Jansen and Krauss (defendants' experts), which was contradicted by Anderson (plaintiff's expert).  Thus, the issue boils down to whether the testimony of plaintiff's expert, Anderson, compels a finding that Dillon's speed was a substantial factor in causing the accident.  It does not.  While we acknowledge Anderson's testimony is imprecise at times—especially regarding the exact point in time that Dillon started hard braking in an attempt to avoid the collision—the testimony certainly does not compel a finding that Dillon would have avoided the collision if he was traveling at the speed limit.

We begin with defendants' experts' testimony.  Jansen testified there would have been no collision had Dillon been traveling within the speed limit at the moment Medina started his turn.  Jansen's opinion rested on his theory that Medina started to execute his turn 3.9 seconds before the collision when the motorcycle was still 280 feet away from the collision.  And Krauss relied on Jansen's testimony in concluding Dillon would have avoided the collision had he been traveling at 35 miles per hour.

Anderson, plaintiff's expert, "disagree[d] very substantially" with Jansen's conclusion that the "van [took] off 3.9 seconds prior to the collision" because the van's speed showed a "very low level of acceleration" at that point and "[i]f [Medina]

9

had accelerated hard at 3.9 seconds, he would have . . . risk[ed] a crash with [the] left-turning car" in front of him. According to Anderson, Medina had not accelerated and moved into the roadway until 1.7 seconds from the crash when the motorcycle was 121 feet away, which is when the van "presented" as a hazard. Anderson also contradicted Jansen's conclusion that Dillon started "hard braking . . . about 93 feet prior" to impact because it "[a]bsolutely does not match the physical evidence at the scene."

Accordingly, not only was Jansen's testimony contradicted, but it also was not " 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (Petitpas, *supra*, 13 Cal.App.5th at p. 304.) The jury was properly instructed that it could "believe all, part, or none of an expert's testimony." The jury was, therefore, entitled to reject the contested premise underlying Jansen's opinion—that the van became a hazard at 280 feet—and therefore reject Krauss's opinion based on that premise.

Without the testimony of Jansen and Krauss, we are left only with Anderson's testimony. Defendants argue that even if the jury disbelieved Jansen and Krauss, Anderson's own testimony compels a finding of comparative fault as a matter of law. In making this argument, however, defendants rely on a misreading of the expert testimony.

Defendants first correctly state Anderson testified that at 1.7 seconds before impact, Dillon was 121 feet from the accident, traveling at 54 miles per hour. But they then incorrectly claim that "according to Anderson, 'at 2.5 seconds . . . [the van is] obvious to the motorcyclist at this point in time.' " Based on this incorrect reading of the record, defendants argue that 2.5 seconds

10

was the "perception" time, and Dillon reacted .8 seconds later (i.e., 1.7 seconds before the accident and 121 feet from the accident). It follows, according to defendants, that because Anderson testified the braking time was only 68 feet if traveling at 35 miles per hour (i.e., less than 121 feet), the accident would not have occurred if Dillon was traveling within the speed limit.

The premise on which defendants' argument rests is not accurate when viewing Anderson's testimony in context and in a light most favorable to the judgment. On direct examination, Anderson testified as follows:

Q: Mr. Anderson, when we left, we were talking about this hazard point based on speed and distance. Can you continue?

A: Yes. What I was saying previously is it was the point where the van becomes an obvious hazard to the motorcyclist. Because for one thing, the left-turning car is trying to clear. The van speed is picked up from a walking pace to 7 miles an hour and it's entering the roadway.

Q: Okay. So at this point in time about 1.7 seconds away from crash when the motorcyclist is 120 feet away, this is when the van actually starts to go at 7.4 miles per hour?

[¶]. . . [¶]

A: Yeah, it's going 7.5 miles an hour at this point in time.

Q: It's your opinion this is the point where the van has committed to going out into the southbound lanes to make the left turn?

11

A: The van committed slightly earlier, probably at 2.5 seconds, but it's obvious to the motorcyclist at this point in time.
[¶]. . . [¶]

Q: Okay. So based on the speed and distance of both the van and the motorcycle, it's this point in time about 1.7 seconds from crash and 120 feet away from the crash by the motorcyclist where you believe the van presents itself as a hazard to the bike?

A: That's what I said, yes.

It is clear from the testimony above that, according to Anderson, Dillon first perceived the motorcycle as a hazard 1.7 seconds before the crash when he was 121 feet from the crash, and not 2.5 seconds as defendants contend. A reasonable trier of fact could thus conclude that Dillon took some time to react to this perception and started hard breaking after his car was 121 feet from the point of collision.

Despite Anderson repeatedly testifying that the van "presented" itself as a hazard when Dillon was 121 feet from the accident, defendants argue the jury was compelled to find that Dillon "reacted" at that time. We are unpersuaded. While Anderson did testify that Dillon's "motorcycle speed has continued to drop at this point in time [referring to when he is 121 feet from the accident], doing about 54 miles an hour," Anderson did not testify he began hard braking in reaction to the hazard. Decelerating is not the same as hard braking in an attempt to avoid a collision. Indeed, Anderson also testified that "we can't actually necessarily see the start of the braking event"

12

and "I don't think we've got a really hard front brake application initially." And, as noted above, Anderson testified that he disagreed with Jansen's conclusion that Dillon started hard braking about 93 feet before the accident because it " [a]bsolutely does not match the physical evidence at the scene." Thus, when read as a whole, nothing in Anderson's testimony compels a finding by the jury that Dillon started hard braking at the 1.7 second mark—when the motorcycle became an "obvious hazard"—to stop before crashing into the van even if he had been traveling at 35 miles per hour.

Defendants have not met their burden of showing the evidence compels a finding that Dillon's negligence was a substantial factor in causing the accident.

## II. The Trial Court Did Not Abuse its Discretion By Denying Defendants' Motion for New Trial

Defendants next contend the trial court abused its discretion by denying their motion for new trial because it "applied the incorrect legal standard." The trial court clearly stated reasons for denying defendants' sufficiency of the evidence challenge demonstrate otherwise.[1]

"A trial court evaluating a new trial motion on [the insufficient evidence ground] sits 'as a thirteenth juror,' asking whether 'the weight of the evidence appears to be contrary to the jury's determination'; in so doing, the court is free to ' "disbelieve witnesses, reweigh the evidence, and draw reasonable inferences therefrom contrary to those of the trier of fact." ' " (*Licudine v.*

---

[1]    Defendants moved for a new trial on several grounds, but their argument on appeal regarding the denial of their new trial motion is limited to the ground of insufficient evidence to support the jury's no comparative fault finding.

13

*Cedars-Sinai Medical Center* (2016) 3 Cal.App.5th 881, 900.) The trial court must be " 'satisfied that the evidence, as a whole, was sufficient to sustain the verdict' "; if not, the court must grant a new trial. (*Barrese v. Murray* (2011) 198 Cal.App.4th 494, 503.)

The trial court properly applied these principles. At the hearing on the new trial motion, the trial court stated: "[I]n assessing the merits of defendants' motion, the court undertook the task of determining whether there was sufficient credible evidence to sustain the jury's verdict weighing the evidence and assessing the credibility of the witnesses. In so doing, the court considered the probative force of the evidence in order to be satisfied that the evidence was sufficient to sustain the verdict. Having undertaken this inquiry including an assessment of the credibility of the parties and witnesses that testified and after reviewing plaintiff and defense counsels' cited authorities as well as the extensive documentation attached by each to the declarations in support of their respective positions, this court is not of the opinion that the weight of the evidence is contrary to the findings of the jury. [¶] Accordingly, defendants' motion for new trial is denied."

Ignoring the trial court's statements above, defendants argue the court "abdicat[ed] [its] judicial duty" by failing to reassess the actual evidence and, instead, "simply stat[ed] that the jury was properly instructed that argument of counsel is not evidence and the jury can weigh and choose to disbelieve the testimony of experts." But the trial court appropriately made this comment—*after* it expressly applied the correct standard—in response to defendants' counsel's assertion that plaintiff's counsel committed prejudicial misconduct in closing argument. In addressing *that* contention, the court stated: "As to Mr.

14

Anderson's testimony, [a]s to [plaintiff's counsel's] reference to it during his closing with regard to improper calculation of speed, as you know the jurors are instructed, number one, the arguments of counsel are not evidence, and that if there is a difference of [opinions] between the experts, they're to weigh the opinions and decide which has the greater weight. So if we—and we certainly had differences of opinion on the experts here. The jurors are instructed 'disregard an opinion that seems unreasonable, that is contradicted, that you don't find fits into the evidence.' If [plaintiff's counsel] wants to refer to opinions in his closing argument claiming that they were stated to be such, the jurors had the ability to refer to the actual testimony to determine whether [plaintiff's counsel] is misrepresenting what was the actual testimony of the witness." This correct statement of the law in no way demonstrates the trial court misunderstood the new trial standard it *expressly* applied.

## III. The Trial Court Did Not Abuse Its Discretion by Precluding Defendants' Counsel from Referencing Certain Impeachment Evidence in Closing Argument

### A. Background

Dillon called his girlfriend, Lisa Valenzuela, to testify about his condition before and after the accident. Valenzuela testified that Dillon is in constant, excruciating pain and while he was once adventurous, extroverted and confident, he is now a different man—he was a "happy-go-lucky" guy, but now his "light" is gone.

Defendants then sought to impeach Valenzuela's testimony that Dillon was a "happy-go-lucky guy" prior to the accident by introducing a declaration signed by Valenzuela two years before the accident, filed in support of her application for a temporary

15

restraining order against Dillon.  Over defendants' objection on Evidence Code section 352 grounds, the trial court permitted defendants to use the declaration to impeach Valenzuela's testimony, stating that defendants' counsel could generally bring up the grounds for the restraining order application including that Dillon "aggressively forc[ed] her into intimacy" and that he "physical[ly] abuse[d]" her.  The court reasoned this "certainly would show that he was angry" before the accident.  The trial court was "concerned," however, that [the declaration] is "substantially more prejudicial than probative" and "to read from [the declaration] would be extraordinarily prejudicial."  It therefore stated it could only be "brought in generally, not necessarily the gory specifics."

On cross-examination, defendants' counsel asked Valenzuela about detailed allegations in the declaration, including, for example, that Dillon "forced himself upon [her] to have sex during a camp trip in front of [her] young child"; "punched [her] and pushed [her] to the ground in the past"; "punched [her] in the stomach when [she was] pregnant with [her] child"; he was "very violent and aggressive towards [her] and [her] pets"; and he "put a towel on [her] face and lit it on fire."  In later proceedings outside the presence of the jury, Dillon objected to the cross-examination of Valenzuela on the ground that defendants' counsel inquired about specific details in the declaration, which went beyond the scope of the trial court's ruling that the declaration could only be brought in "generally."  The trial court stated it would not strike the testimony at that time, and if plaintiff's counsel wanted "to get the transcript, [the court would then] revisit the transcript."

16

After Dillon's counsel reviewed the transcript of the cross-examination of Valenzuela, Dillon moved for a mistrial based on the questioning about the declaration and the fact that the temporary restraining order "wasn't even granted." The court denied the mistrial motion but invited both sides to draft a curative instruction for the court's consideration.

Later in the trial, the court gave a curative instruction, the language of which the defendants agreed was "appropriate": "In this trial, Ms. Lisa Valenzuela was questioned about prior statements she made. These prior statements were admitted for the limited purpose of impeachment and may only be considered by you to evaluate this witness' testimony at trial and shall not be used for any other purpose, this includes determining the issues of negligence, causation, and allocation of fault. You also shall not speculate or discuss whether the events she described occurred or not."

On the morning of March 21, 2024, before defendants' counsel continued his closing argument, the court held a meeting with the parties' counsel in chambers. The court explained that defendants' counsel could mention the temporary restraining order declaration "generally" but "at the end of the day, the minimal value of you impeaching Ms. Valenzuela, who is not a party to the action, is—everyone agrees—I think that is outweighed by focusing on those acts, and that's what I'm concerned about." The court further stated: "What you can use is a general comment that what she described in terms of what he was like before and what he's like now is a result of the injuries that he suffered in the accident—that that was actually not quite accurate. I mean you impeached her with some of that. But I just don't want the jury to focus on those acts [specifically

17

detailed in the declaration], because at the end of the day, I don't believe that they are pivotal to anybody's claim."

When defendants' counsel continued his closing argument, he noted Valenzuela's testimony that Dillon was a "caring father and partner" before showing a slide addressing her "impeachment." The appellate record does not contain the slide, but defense counsel described "the impeachment" as "despicable, disgusting, awful." Defendants' counsel continued: "That's impeachment. That's your job to weigh the evidence and determine what is truthful, to consider what she said on direct examination versus what she said on cross-examination. And I'm not going to repeat it. Disgusted – disgusting, despicable, awful; right? . . . You were instructed by the court not to consider whether or not those acts actually happened . . . . But you do weigh the evidence, and you determine what is impeachment, what she said on direct examination, what she said on cross-examination."

### B. Analysis

Defendants contend the trial court abused its discretion by precluding them from reciting specific details from Valenzuela's declaration in closing argument. We conclude the trial court did not exceed its broad discretion.

"A trial court 'is given great latitude in controlling the duration and limiting the scope of closing' argument." (*People v. Edwards* (2013) 57 Cal.4th 658, 743.) The "trial court retains discretion to impose reasonable time limits and to ensure that argument does not stray unduly from the mark." (*People v. Marshall* (1996) 13 Cal.4th 799, 854– 855 (*Marshall*).) We review the trial court's decision to limit closing argument for abuse of discretion. (*People v. Simon* (2016) 1 Cal.5th 98, 147.) Under

this standard, we do not disturb or reverse a trial court's ruling unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice. (*People v. Chhoun* (2021) 11 Cal.5th 1, 26.)

Here, the trial court concluded that "generally" describing what Valenzuela "agreed was true" in her declaration was sufficient to address the inconsistency in her testimony, which was the "purpose" for admitting the impeachment evidence. The trial court further reasoned that permitting defendants' counsel to repeat the specific details in the declaration risked undermining the curative instruction and could "draw the jury's focus away from the instant case." (See *Marshall, supra*, 13 Cal.4th at p. 855.) In other words, the trial court balanced competing factors by allowing defendants to make their central point about Valenzuela's truthfulness without permitting defendants to describe specific, unduly prejudicial, allegations regarding domestic violence. This was not an arbitrary, capricious or patently absurd ruling. (See *People v. Farley* (2009) 46 Cal.4th 1053, 1131 [precluding argument describing details of other murders, but permitting argument about the "central point" that murder was not the "worst of the worst"].) Defendants have not shown an abuse of discretion.

## IV. Defendants Forfeited Their Attorney Misconduct Claim and Their Arguments Fail on the Merits

Defendants further contend that the trial court erred by denying their motion for a new trial on the ground that Dillon's counsel committed prejudicial misconduct. They argue counsel improperly: (1) referred to precluded evidence and violated in limine rulings; (2) made a golden rule argument; (3) argued who will be responsible to pay any judgment; and (4) made personal

19

attacks against defendants' counsel and experts. As discussed below, defendants forfeited these arguments by not objecting to any of the instances of purported misconduct. Moreover, even if not forfeited, our review of the record demonstrates that most of the alleged statements by Dillon's counsel, when viewed in context, were not improper. And while we agree with defendants that certain statements by Dillon's counsel were either inappropriate or pushed the boundary of permissible argument, defendants cannot show that any potential misconduct was so pervasive or egregious that it prevented the jury from rationally considering the evidence admitted at trial.

We begin with forfeiture. Generally, " '[t]o preserve for appeal an instance of misconduct of counsel in the presence of the jury, an objection must have been lodged at trial and the party must also have moved for a mistrial or sought a curative admonition.' " (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 295 (*Bigler-Engler*).) "The purpose of these requirements is to allow the trial court an opportunity to remedy the misconduct and avoid the necessity of a retrial; a timely objection may prevent further misconduct, and an admonition to the jury to disregard the offending matter may eliminate the potential prejudice." (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1412.) "Raising the issue for the first time in a posttrial motion is insufficient because the trial court has no ability to correct the misconduct at that point." (*Bigler-Engler,* at p. 295.) The failure to timely object and move for a mistrial or request an admonition forfeits any claim of error "unless the misconduct was so persistent that an admonition would have been inadequate to cure the resulting prejudice." (*Ibid*.) "Attorney misconduct is incurable only in extreme cases." (*Rayii,* at p. 1412.)

20

Here, defendants did not timely object to any of Dillon's counsel's closing statements.  Nor did they move for a mistrial or request an admonition.  Because defendants have not shown this is one of those "extreme cases" in which the purported misconduct was incurable, we conclude defendants failed to preserve their attorney misconduct argument.

Even if not forfeited, defendants' argument fails on the merits.  First, defendants assert that Dillon's counsel violated in limine rulings and argued based on Anderson's precluded and stricken testimony about causation.  As noted above, Anderson was precluded from testifying about human factor opinions.  He was permitted, however, to "give an opinion based on distance and speed as to when something became a hazard or whether collision could have been avoided by either side."

In support of their argument that Dillon's counsel repeatedly violated the trial court's orders, defendants include a string of citations to the reporter's transcript.  Those cites include several pages of the direct examination of Anderson, some of which include sustained objections by defendants on the grounds of "beyond the scope" and "lacks foundation."  Critically, almost all of the cited testimony is *before* the sidebar held in chambers in which the court clarified the permitted scope of Anderson's testimony.  Defendants then claim, without any citations to the record, that based "on such improper and precluded testimony," Dillon's counsel argued to the jury that Dillon's negligence was not a substantial factor in causing the accident.  Defendants have not met their burden of showing attorney misconduct.

Defendants also argue Dillon's counsel improperly argued in rebuttal closing argument that "the jury should not worry about giving a verdict against Medina because LADWP will be

21

the one paying any judgment." But defendants leave out the context. In his opening statement, defendants' counsel noted Medina was married, a grandparent to one grandchild with another grandchild on the way, and a Gulf War veteran. To rebut defendants' attempt to make the jury "feel sympathetic" to Medina, Dillon's counsel read a stipulated jury instruction. This instruction provided that "LADWP is responsible for any harm caused by Medina's negligence" and told the jury that, despite defendants' implication to the contrary, "Medina is not going to be left holding the bag." In these circumstances, Dillon's rebuttal argument was not improper.

Defendants next argue Dillon's counsel committed misconduct in closing argument by making a golden rule argument. A "golden rule argument" is an argument "in which counsel asks jurors to put themselves in the plaintiff's shoes and ask what compensation they would personally expect." (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 797 (*Cassim*).) "An attorney's appeal in closing argument to the jurors' self-interest is improper and thus is misconduct because such arguments tend to undermine the jury's impartiality." (*Ibid*.)

Defendants contend plaintiff's counsel repeatedly violated the prohibition against golden rule arguments by: (1) asking the jury to imagine making the turn[2]; (2) asking the jury to imagine if

---

[2] Dillon's counsel argued: "When you're turning left, you know that the immediate hazards are coming from your left. So it's a very dangerous thing to do, to look right last before you start going. . . . If you're sitting there, you're about to make a left turn, and then you look right, and that's the last direction you look in, and then you proceed forward after looking right without looking left again—that's scary. It's dangerous."

they lost their ability to live their normal life because of an injury[3]; and (3) "asking the jury how much they would charge to undergo the alleged injuries and pain by asking them to imagine a van, full of millions of dollars, offered in exchange for suffering the injuries and pain, with the flimsiest premise of the offer being made to Dillon."  Dillon counters that his counsel's comments were proper because: (1) the use of the impersonal "you" did not ask the jury to imagine being Medina, but rather made clear that any driver would not make that unsafe turn; (2) counsel prefaced his statements to the jury about losing their ability to live a normal life by stating that "everyone's quality of life is different" and Dillon's "life before is different than all of yours"; and (3) counsel's "van analogy" did not ask jurors to put themselves in plaintiff's position, but merely made clear that plaintiff would not choose to suffer those injuries in exchange for payment.

We are not entirely satisfied by Dillon's explanation.  A juror could reasonably interpret at least some of the statements as urging—or, at a minimum, implying—that they put themselves in Dillon's position.  That is improper.  (See *Cassim, supra,* 33 Cal.4th at p. 797.)  In *this* case, however, even if some of the statements were improper, defendants have not shown any misconduct resulted in prejudice.  They claim the statements "inflamed the jury to come to a verdict based on passion and

---

[3]    Defendants do not quote the exact excerpt from the transcript, but on the pages they cite, Dillon's counsel argued: "But what everyone values is their own version of what's normal. . . .  And everyone might have different interests, and everyone might have different hobbies, but what each of you like to do—that's worth a lot to you.  [¶]  But if it's suddenly taken away from you . . . that's worth a lot.  That's—that's quality of life that you can't replace."

23

prejudice and not the evidence[,]" but, as discussed below in section V, the verdict was supported by substantial evidence, and the statements were not so "egregious and pervasive." (See *Pilliod v. Monsanto Co.* (2021) 67 Cal.App.5th 591, 636 [holding defendant did not show prejudice where "some of counsel's conduct was clearly improper" but "the record shows these were isolated and relatively minor incidents that occurred in the course of a complex six-week trial, not egregious and pervasive"].)

Finally, defendants argue Dillon's counsel made inflammatory personal attacks on their counsel and experts. Defendants fail to cite specific statements. Instead, they provide a string of citations to several pages of the reporter's transcript. Several of those citations are to a hearing on the parties' motions in limine *before* trial began, and thus, were not in the presence of the jury. Most of the other citations do not include any improper personal attacks.

We acknowledge that there were instances when Dillon's counsel went too far in rebuttal closing argument and crossed the line between zealous advocacy and incivility. For example, Dillon's counsel inappropriately suggested, without any basis, that defendants' counsel urged Medina to lie on the stand: "That was before [defense counsel] got him up into his building a couple months ago and he told him to change his testimony on the stand." Dillon's counsel also inappropriately stated: "And so [defense counsel], once again, came up on cross-examination and misled you by insinuating that we're the bad guys." Dillon's counsel also made a potentially offensive remark, which is unbecoming of an officer of the court: "I can't believe [defense counsel] just said that you should ask yourselves, 'What would [defense counsel] do?' I mean, what is he? Jesus? I mean, that's

24

what—what does that mean, what would he do?" While we do not condone such conduct, defendants have not demonstrated that these isolated incidents resulted in any prejudice. (See *Cassim, supra*, 33 Cal.4th at p. 805 [misconduct during closing argument did not result in prejudice considering its "brevity and indirect nature"].) Thus, the trial court did not err in determining there was no prejudicial attorney misconduct.[4]

## V.     The Jury's Award of Noneconomic Damages Was Not Excessive

Defendants lastly contend they are entitled to a new trial because the jury's award of $3,000,000 for past noneconomic loss and $6,500,000 for future noneconomic loss " 'shock[ed] the conscience and suggest[ed] passion or prejudice on the part of the jury." We are unpersuaded.

Our "review of the jury's determination of noneconomic damages is ' "very narrow. " ' " (*Phipps v. Copeland Corp. LLC* (2021) 64 Cal.App.5th 319, 343.) " 'The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. They see and hear the witnesses and frequently . . . see the injury and the impairment that has resulted therefrom. As a result, all presumptions are in favor of the decision of the trial court [citation]. . . . An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests

---

[4]     In denying defendants' motion for new trial, the trial court stated at the hearing: "And it's my opinion, based on having observed all of it and having an opportunity to go back and read much of it, that the verdict was not the result of conduct by [Dillon's counsel] during his closing argument."

25

passion, prejudice or corruption on the part of the jury.' " (*Bigler-Engler, supra,* 7 Cal.App.5th at p. 299.)

"Accordingly, '[w]e review the jury's damages award for substantial evidence, giving due deference to the jury's verdict and the trial court's denial of the new trial motion.' " (*Burchell v. Faculty Physicians & Surgeons etc.* (2020) 54 Cal.App.5th 515, 527.) " 'There are no fixed or absolute standards by which an appellate court can measure in monetary terms the extent of the damages suffered by a plaintiff as a result of the wrongful act of the defendant. The duty of an appellate court is to uphold the jury and trial judge whenever possible. [Citation.] The amount to be awarded is "a matter on which there legitimately may be a wide difference of opinion" [citation].' " (*Bigler-Engler, supra,* 7 Cal.App.5th at p. 299.)

Applying these principles, we conclude substantial evidence supported the award. Defendants assert "Dillon experienced orthopedic injuries and some residual discomfort and pain, but he returned to independent living, he denied any cognitive impairment, and he presented no evidence of permanent disfigurement or debilitating chronic pain." This is a gross simplification of the evidence presented at trial and fails to fairly summarize the evidence supporting noneconomic damages. Among other evidence, Dillon testified he was in "excruciating pain, yelling, screaming, crying" after the accident and felt "paralyzed" while "bedridden" in the hospital; after leaving the rehabilitation facility, he "felt helpless" because he could not do "anything for himself"; it is still "hard for [him] to be able to get out of bed" because he is "always in . . . excruciating pain"; he cannot do "day-to-day" functions, such as "opening a bottle" or playing soccer with his son; the accident has "changed [his]

26

life . . . in a really bad way" and made him "stressed" and "anxious"; and he worries his pain is not going to get better. Multiple orthopedic surgeons also testified that Dillon will need further surgeries and will likely suffer from chronic pain for the rest of his life. And Dillon's life care planner, Dr. Neil Ghodadra, testified that Dillon will "require . . . medical care, management, and treatment for the remainder of his life." Thus, on this record, we cannot conclude the noneconomic damages award is so large that " 'it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury.' " (*Bigler-Engler, supra,* 7 Cal.App.5th at p. 299.)

We also reject defendants' attempt to invalidate the verdict by simply comparing this case to other verdicts. Defendants assert that, in their motion for new trial, they presented examples of amounts awarded in prior cases for similar injuries, ranging from $1.4 to $4.5 million in noneconomic damages. But "[c]omparing verdicts" is "of limited utility." (*Fernandez v. Jimenez* (2019) 40 Cal.App.5th 482, 491.) That is because " 'each case must be decided on its own facts and circumstances. Such examination demonstrates that such awards vary greatly. [Citations.] Injuries are seldom identical and the amount of pain and suffering involved in similar physical injuries varies widely.' " (*Ibid.*) Moreover, defendants' citation to LexisNexis alerts summarizing jury verdicts in three "orthopedic fracture injur[y]" cases is of limited persuasive value given that we do not have a record of the evidence admitted at those trials. (*Bigler-Engler, supra*, 7 Cal.App.5th at p. 303.)

Accordingly, we conclude defendants have not demonstrated the jury's award of noneconomic damages—which

was approximately 36% of the $26,000,000 sought by plaintiff's counsel in closing argument—was excessive.

## VI. The Trial Court Did Not Abuse Its Discretion in Awarding Costs of Proof

Under Code of Civil Procedure section 2033.420, "[i]f a party fails to admit the genuineness of any document or the truth of any matter when requested to do so . . . , and if the party requesting that admission thereafter proves the genuineness of that document or the truth of that matter, the party requesting the admission may move the court for an order requiring the party to whom the request was directed to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees." (*Id.*, subd. (a).)

The court "shall make this order" unless it finds one of the exceptions listed in Code of Civil Procedure section 2033.420, subdivision (b) applies. As relevant here, one exception is if "[t]he party failing to make the admission had reasonable ground to believe that that party would prevail on the matter." (*Id.*, subd. (b)(3).) The party seeking to benefit from an exception listed in subdivision (b) bears the burden of establishing the exception. (*Spahn v. Richards* (2021) 72 Cal.App.5th 208, 216.) We review the trial court's order granting a motion for costs of proof for abuse of discretion. (*Association for Los Angeles Deputy Sheriffs v. Macia* (2021) 63 Cal.App.5th 1007, 1024.)

Here, on February 24, 2021, Dillon served LADWP with requests for admission that it (1) was "the cause of the [accident]" and (2) "failed to yield to Plaintiff." On May 24, 2021, LADWP responded to both requests that "[a]ssuming this request is intended to include [its] employee Medina, responding party states: deny."

28

After the jury found Medina's negligence was the sole cause of the accident, Dillon moved for attorneys' fees under Code of Civil Procedure section 2033.420, subdivision (a) for "time expended in proving these facts." Dillon sought $516,000, which included $258,300 of attorneys' fees and a lodestar multiplier of 2.0, and $227,751.76 in costs. Defendants opposed the motion, arguing they had a good faith belief that Dillon's excessive speed was the sole cause of the accident.

After a hearing on the motion, the trial court concluded it was not "reasonable for the defense to deny that Mr. Medina failed to yield to plaintiff." The court focused on the second request—i.e., the failure to yield request—stating that the videotape made it "crystal clear" that Medina failed to yield to plaintiff. In assessing the appropriate amount of attorneys' fees, the trial court noted that "only expenses incurred in proving the matters denied by defendant" are authorized, and observed that "plaintiff's counsel has included herein trial preparations which extend well beyond the issue of negligence in failing to yield." Thus, after a comprehensive review of the attorneys' declarations and exhibits submitted in support of the motion for fees and costs, the court concluded plaintiff was only entitled to "attorney fees for 105 hours of attorney time [as opposed to the 369 hours claimed by plaintiff] which is reasonably attributable to proving liability for the accident on the part of the defendants." With respect to plaintiff's claim for costs in the amount of $227,751.76, the trial court concluded: "Because plaintiff has failed to provide the court with documentation from any of the vendors listed to assist the court in assessing which, if any, of the costs listed are associated only with proving liability and failure to yield, the

29

court has no evidence on which to base reimbursement for those costs. Accordingly, payment for costs is not ordered."

Defendants have not met their burden on appeal to demonstrate an abuse of discretion. They first argue, without citation to the record, that "[i]t is clear" defendants had a good faith belief and were reasonable in denying that they caused the accident and failed to yield. But as the trial court stated at the hearing on the motion, "the videotape of the incident left no doubt that Medina failed to yield to the plaintiff who had the right-of-way." The trial court further explained that "it was reasonable in light of the videotape that in my opinion shows Mr. Medina going out, not stopping at all until you can see the impact to the van caused by the motorcycle. But there was no yielding whatsoever. So the plain language admit that you failed to yield to plaintiff, I don't think it was disputed that plaintiff had the right-of-way and that Mr. Medina was entering the intersection against plaintiff's right-of- way." After reviewing the videotape, we agree with the trial court's assessment. We discern no abuse of discretion.

Nor did the trial court abuse its discretion in determining the appropriate amount of attorneys' fees. Defendants argue "Dillon's counsel only submitted a two-page vague accounting" and it was "not divided into just proof of the requests, but many of the categories expressly include 'tasks performed' for work related to 'liability and damages.'" They completely ignore, however, the trial court's careful analysis of the attorneys' fees sought to ensure only those related to proving liability, i.e., failure to yield, were awarded. The transcript of the hearing is replete with examples of the court combing through the declarations and awarding fees for only those hours it found plaintiff's counsel reasonably expended in proving Medina failed

to yield to plaintiff.  For instance, the court stated: "Plaintiff lists four hours of time spent concerning the deposition of John Gardiner, who is a biomechanics' expert that testified regarding the impact forces applied to plaintiff's body relative to the injuries sustained.  This testimony concerns causation of injuries and not liability.  This time will be discounted."  The trial court further noted: "Of the 25 witnesses presented during this trial, only five witnesses testified concerning the cause of the accident and defendants' failure to yield . . . . These liability witnesses equate to 20 percent of all witnesses present at trial.  Accordingly, of the 305 hours of trial preparation and trial time claimed by plaintiff, the court determines that 61 hours is reasonably attributable to proving the matters denied by defendant."

Thus, the trial court properly excluded any claimed expenses to the extent they related to issues outside the scope of the requests for admission.  Defendants do not point to anything in the record demonstrating otherwise.

## DISPOSITION

The judgment and order are affirmed.  Dillon is awarded his costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

TAMZARIAN, J.

We concur:

ZUKIN, P. J.

MORI, J.